**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SHAWN BUENDING, ROBERT
DOHMEN, THOMAS K. BROWN,
HARRY S. FIELDS, WENDY FIELDS,
SHAWN MOORE and DAGMAR
MOORE,

      Plaintiffs,

v.                                                            Case No: 8:19-cv-1473-T-30SPF

TOWN OF REDINGTON BEACH,

      Defendant.

_____

## <u>ORDER</u>

Plaintiffs ("Property Owners") own beachfront property in the Town of Redington Beach (the "Town"). In June 2018, the Town passed an ordinance declaring that the public could use the dry sand beach areas of Property Owners' properties based on customary use. Property Owners sued the Town, claiming (1) the ordinance is inconsistent with § 163.035, Florida Statutes, (2) the ordinance amounts to a facial taking of their properties, and (3) the ordinance amounts to an as-applied taking of their properties. Additionally, Property Owner Wendy Fields brought a First Amendment retaliation claim against the Town since it removed her from the Town's Board of Adjustment because she filed this lawsuit.

The parties have now cross-moved for summary judgment on all claims. Property Owners also seek to exclude the testimony of the Town's expert witness, a historian who opined the customary use doctrine applies to the dry sand areas of Property Owners'

properties—meaning that residents, visitors, and tourists have an ongoing right to access those portions of the properties for recreational purposes. The Court concludes that the Town expert's legal conclusion that the customary use doctrine applies should be excluded but that the remainder of his testimony is admissible. And the Court concludes that based on the record evidence, Property Owners are entitled to summary judgment in their favor on all claims.

## UNDISPUTED FACTS

The material facts are not in dispute.

Property Owners own beachfront property within the Town. Their properties extend to the mean high-water line ("MHWL"), which includes the dry sand beach area landward of the MHWL. These property boundaries were established in the 1930s, before the formation of the Town in 1945.

The Town is primarily a single-family residential community that sits between Madeira Beach to the south and North Redington Beach to the north. The Town does not have tourist facilities or promote itself as a tourist destination. The Town also restricts parking in the Town to its residents and requires a parking pass to park at Beach Park.

In 2018, Florida enacted § 163.035, Florida Statutes, which sets forth how governmental entities can establish recreational customary use of beaches. The following two provisions are relevant to Property Owners' claims and the Town's motion:

**(2) Ordinances and rules relating to customary use.--**A governmental entity may not adopt or keep in effect an ordinance or rule that finds, determines, relies on, or is based upon customary use of any portion of a beach above the mean high-water line, as defined in s. 177.27, unless such

ordinance or rule is based on a judicial declaration affirming recreational customary use on such beach.

...

**(4) Applicability.--**This section does not apply to a governmental entity with an ordinance or rule that was adopted and in effect on or before January 1, 2016, and does not deprive a governmental entity from raising customary use as an affirmative defense in any proceeding challenging an ordinance or rule adopted before July 1, 2018.

§ 163.035, Fla. Stat. The statute took effect July 1, 2018. On June 6, 2018, several weeks before the statute took effect, the Town passed Ordinance § 2018-03 (the "Ordinance").

The Ordinance establishes customary use of all dry sand beaches in the Town for recreational purposes. So the public may use any dry sand beach in the Town—including the dry sand beach portions of Property Owners' properties—for these purposes:

    a.  Traversing the beach;

    b.  Sitting on the sand, in a beach chair, or on a beach towel or blanket;

    c.  Sunbathing;

    d.  Picnicking;

    e.  Fishing;

    f.  Swimming or surfing off the beach;

    g.  Placement of surfing or fishing equipment for personal use; and

    h.  Building sand creations unless prohibited by § 4-9 of this code concerning sea turtles.

Ordinance, subsection (d). The Ordinance provides for only a 15-foot buffer from either the seaward toe of the dune or the habitable structure, whichever is more seaward. Ordinance, subsection (c). The Town never sought a judicial declaration affirming recreational customary use on its dry sand beaches after § 163.035 took effect.

3

After the Ordinance was passed, Property Owners experienced an increase in people coming onto their properties. For instance, one Property Owner had strangers hold a wedding on the dry sand portion of his property. Another Property Owner had strangers smoking and drinking behind their home, and the strangers refused to allow the Property Owner to exit onto the beach.

In April 2019, the Town's mayor and a commissioner met with the Pinellas County Sheriff's Office to discuss the Ordinance and ensure Property Owners were not interfering with the public's use of the dry sand beach portion of their Properties. As a result, when Property Owners called the Sheriff's Office to report trespassers, the Sheriff's Office told Property Owners there was nothing it could do because of the Ordinance.

In June 2019, Property Owners filed this lawsuit against the Town, claiming that the Ordinance violates § 163.035, and that enactment and enforcement of the Ordinance amounts to a taking under the U.S. and Florida Constitutions. Subsequently, at a Town Commission meeting, one commissioner raised the issue of Property Owner Fields having filed the lawsuit and suggesting that it may be inappropriate for her to remain on the Town's Board of Adjustment (the "Board"). Fields was present at the meeting and was asked if she had anything to say. Fields explained that, if the Commission asked her to resign, she would be "more than happy to" despite her belief that she has been more than fair. (Doc. 40, Ex. C). After Fields's statement, the Mayor polled the Commissioners, who all voted to have Fields submit her resignation. Fields said she "accepted" the Commission's decision, and the Mayor asked her to put her resignation in writing.

4

Later, though, Fields chose to not submit her resignation since there had been no complaints regarding her performance on the Board. At the Commission's next meeting, Commissioners voted unanimously to remove Fields from the Board. Following the Town's decision to remove Fields from the Board, Property Owners amended the complaint to include a claim for First Amendment retaliation.

## DISCUSSION

The parties filed cross motions for summary judgment, and Property Owners moved to exclude the Town's expert. The Court will first analyze the *Daubert* motion to exclude the Town's expert before turning to the summary judgment motions. As explained below, the Court concludes the *Daubert* motion should be granted in part to exclude the expert's legal conclusion that recreational customary use applies to Property Owners' properties. The Court also concludes that Property Owners are entitled to summary judgment on all their claims because (1) the Town kept the Ordinance in effect without seeking a judicial declaration affirming customary use, (2) the Town failed to demonstrate that customary use is a viable defense to Property Owners' claims, and (3) passage and enforcement of the Ordinance amounts to a taking of Property Owners' properties. Further, the Court concludes the Town was not justified in removing Fields from her position on the Board.

**A. Motion to Exclude Testimony of Dr. Joe Knetsch (Doc. 46)**

**1. Standard for excluding expert testimony**

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"'[T]he task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand' is assigned to the district court." *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).

In *Rink v. Cheminova, Inc.*, 400 F.3d 1286 (11th Cir. 2005), the Eleventh Circuit explained:

> To fulfil their obligation under *Daubert*, district courts must engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence.

*Id.* at 1291–92 (internal quotation marks omitted).

In assessing the reliability of a scientific expert's testimony, district courts should consider the following four factors: (1) whether the expert's methodology has been tested or can be tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community. *United Fire & Cas. Co.*, 704 F.3d at 1341 (citing *Daubert*, 509 U.S.

at 593–94). "At the same time, the [Supreme] Court has emphasized that these factors are not exhaustive and are intended to be applied in a 'flexible' manner." *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

With respect to experts with technical rather than scientific knowledge the Supreme Court in *Kumho Tire* concluded that:

> *Daubert*'s general holding—setting forth the trial judge's general "gatekeeping" obligation—applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. *See* Fed. Rule Evid. 702. We also conclude that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.

526 U.S. at 141–42.

The objective of *Daubert*'s gatekeeping requirement is to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The gatekeeping role is "significant" because an "expert's opinion 'can be both powerful and quite misleading.'" *U.S. v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert,* 509 U.S. at 595). *Daubert* also reminds litigants that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596.

**2. Analysis**

Property Owners move to exclude the testimony of Dr. Joe Knetsch, a historian hired by the Town to prove recreational customary use of the subject beaches. Dr. Knetsch opined in his report:

> Based on the foregoing historical analysis, it is my opinion that the portion of Florida beach which includes the lot owned by the Plaintiffs has been continuously and through the history of the State of Florida [sic] accessed and used by members of the public such that, in my opinion, the customary use doctrine would apply and residents, visitors and tourists do have the ongoing right to access the Town's beach to engage in the historically traditional uses which the Town has authorized in its code.

(Doc. 45-2, pp. 9–10).

Property Owners seek to exclude his testimony for the following reasons: (1) the Town belatedly disclosed Dr. Knetsch and the materials on which he relied; (2) Dr. Knetsch's opinion is an impermissible legal conclusion; and (3) Dr. Knetsch's opinion is not helpful to the trier of fact because his opinion (a) does not relate to Property Owners' properties and (b) regards customary use of the shoreline, not the dry sand beach.[1] The Court agrees that Dr. Knetsch cannot opine as to whether the customary use doctrine applies because that is a legal conclusion. But the Court will permit the remainder of his testimony, which concerns the historical uses of beaches in Pinellas County.

---

[1] Property Owners also argue that Dr. Knetsch's methodology is unreliable and his opinion is simply a conduit for hearsay. The Court rejects these arguments without further discussion as Property Owners ignore the fact that Dr. Knetsch's area of expertise is history, and his methodology of talking to a few sources with knowledge and reviewing historical documents is a sufficiently reliable method within his area of expertise.

### a.  Untimely disclosure of Dr. Knetsch and source materials

The Court concludes that the Town's failure to disclose Dr. Knetsch sooner and its failure to timely provide the materials on which he relied does not merit exclusion under these facts. Here are the basic facts on which Property Owners rely: Dr. Knetsch's report is dated March 24, 2019. This case was filed in June 24, 2019, yet the Town did not disclose Dr. Knetsch or his report in its initial disclosures. After the deadline for the Town to disclose its expert passed in November 2019, the Town was granted an extension and first disclosed Dr. Knetsch to Property Owners on December 4, 2019. The Town provided Property Owners only with Dr. Knetsch's 9-page report. Property Owners deposed Dr. Knetsch on December 20, 2019, the last day of discovery, during which Dr. Knetsch provided some additional source materials on which he relied in preparing his report. On January 9, 2020, after the close of discovery, the Town provided still further materials on which Knetsch relied. None of these materials, which were known to the Town, were identified in the Town's disclosures or provided before the end of discovery.

The Town admits all these facts. Dr. Knetsch, apparently, was retained in an earlier-filed state court case challenging the Ordinance, and counsel ultimately decided to use Dr. Knetsch in this case as well. And despite Dr. Knetsch being retained in the earlier case, he had never been disclosed as an expert in that case. While the Town admits it could and should have disclosed Dr. Knetsch sooner, it argues Property Owners should have moved for an extension of the discovery deadline if they did not have ample time to prepare after his disclosure. In other words, the Town argues Property Owners' failure to seek an extension is the issue—not the Town's failure to disclose Dr. Knetsch.

Although the Court concludes the Town's argument is disingenuous at best, the belated disclosure of Dr. Knetsch, his report, and his source materials do not warrant exclusion under these circumstances because Property Owners were not prejudiced. As will be discussed more thoroughly below, Property Owners deftly deposed Dr. Knetsch in such a manner that proves fatal to the Town's claim of customary use. In fact, Dr. Knetsch's testimony is more helpful to Property Owners than it is the Town in many respects.

### b.  Opinion is a legal conclusion

Property Owners next take aim at Dr. Knetsch's opinion that customary use applies and that residents, visitors, and tourists have a right to use the dry sand beach area of Property Owners' properties. The Town concedes it is improper for Dr. Knetsch to offer this legal conclusion as his opinion but argues his entire testimony should not be excluded. (Doc. 70, p. 6). The Court agrees with the Town.

The parties do not dispute that whether customary use applies is a question of law for the Court to decide. As such, Dr. Knetsch's legal conclusion masked as his opinion that customary use does apply must be excluded. *See Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness ... may not testify to the legal implications of conduct; the court must be the jury's only source of law.").

That said, the remainder of Dr. Knetsch's testimony regarding the historical use of beaches in Pinellas County does not suffer from the same defect. So the Court concludes it would be improper to exclude Dr. Knetsch's testimony in its entirety given that the improper legal conclusion can simply be excised from his report.

### c. Opinion is not helpful to the trier of fact

Property Owners' final argument is that Dr. Knetsch's opinion is not helpful to the trier of fact because his opinion does not relate to Property Owners' properties and concerns customary use of the shoreline—not the dry sand beaches. Property Owners point out that Dr. Knetsch did not even know which town retained him, that the historical documents on which he relied spanned from Pass-A-Grill beach (near the southern end of Pinellas County) to beaches north of the Town, that he had never seen the Ordinance, and that most of his deposition testimony made clear he was referring to the shoreline as opposed to the dry sand beach landward of the MHWL. The Town argues that Dr. Knetsch's opinion is helpful in determining whether customary use applies to the area, but does not address the specific issues pointed out by Property Owners.[2]

The Court again agrees with the Town. While there are potential issues with Dr. Knetsch's opinion, those issues go to the weight his testimony should be given, not its admissibility. So the Court concludes Dr. Knetsch's testimony regarding historical recreational customary uses of beaches in Pinellas County is admissible.

---

[2] The Court assumes that the Town ignores the specific arguments, in part, because of an affidavit it filed from Dr. Knetsch in response to the *Daubert* motion that offers new opinions. (Doc. 67-1). The Court concludes this affidavit should be stricken as an untimely disclosure from Dr. Knetsch under Federal Rule of Civil Procedure 37(c), *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 (11th Cir. 2007); and is an improper attempt to create summary judgment issues by offering contradictory opinions. *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."). So the Court will not consider the affidavit.

**B. Cross Motions for Summary Judgment (Docs. 40 and 63)**

**1. Summary judgment standard**

Motions for summary judgment should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted); Fed. R. Civ. P. 56(c). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248–49.

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior*

*Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir.1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## 2. Analysis

The summary judgment motions raise three main issues regarding Property Owners' claims: (1) whether the Ordinance violates § 163.035, (2) whether recreational customary use applies to the subject properties, and (3) whether enactment and enforcement of the Ordinance amounts to a taking of the properties. Separately, the Court must address whether the Town's removal of Fields from the Board violated her First Amendment rights. The Court concludes (1) the Town violated § 163.035 by keeping in effect the Ordinance without a judicial declaration; (2) the Town failed to establish customary use applies to Property Owners' properties; and (3) passage of the Ordinance was a taking of Property Owners' properties. Finally, the Court concludes the Town has not adequately justified removing Fields from the Board.

### a. Ordinance violates § 163.035, Fla. Stat.

As a reminder, § 163.035 provides in relevant part as follows:

**(2) Ordinances and rules relating to customary use.--**A governmental entity may not adopt or keep in effect an ordinance or rule that finds, determines, relies on, or is based upon customary use of any portion of a beach above the mean high-water line, as defined in s. 177.27, unless such

ordinance or rule is based on a judicial declaration affirming recreational customary use on such beach.

...

**(4) Applicability.--**This section does not apply to a governmental entity with an ordinance or rule that was adopted and in effect on or before January 1, 2016, and does not deprive a governmental entity from raising customary use as an affirmative defense in any proceeding challenging an ordinance or rule adopted before July 1, 2018.

§ 163.035, Fla. Stat.

Property Owners argue the Town's Ordinance, which was passed on June 6, 2018, violates the statute because the Town kept the Ordinance in effect after July 1, 2018, without seeking a judicial declaration affirming recreational customary use. The Town argues keeping the Ordinance in effect after July 1, 2018, does not violate the statute because ordinances passed after January 1, 2016, but before July 1, 2018, can be kept in effect without receiving a judicial declaration.[3] The Court agrees with Property Owners.

As the Court explained when ruling on the Town's motion to dismiss (Doc. 35), a plain reading of § 163.035 indicates that a governmental entity cannot "keep in effect an ordinance" based on customary use of beaches "unless such ordinance ... is based on a judicial declaration affirming recreational customary use on such beach." § 163.035(2), Fla. Stat. The statute then says it does not apply to ordinances adopted and in effect by January 1, 2016. § 163.035(4), Fla. Stat. So the statute prohibits any governmental entity

---

[3] The Town also appears to argue that it had other ordinances establishing recreational customary use passed prior to January 1, 2016, identifying § 6-134 and §15-57. (Doc. 40, pp. 6–7). But neither of these statutes establish recreational customary use of the dry sand beach areas of Property Owners' properties, thus the Town is not exempt from complying with § 163.035.

from keeping in effect an ordinance based on customary use of beaches unless (1) a judicial declaration affirmed recreational customary use on the subject beach or (2) the ordinance was adopted and in effect before January 1, 2016. The Town's Ordinance was neither supported by a judicial declaration affirming recreational customary use of all sand beaches in the Town, nor was it passed before January 1, 2016. That § 163.035(4) permits a governmental entity to raise customary use as an affirmative defense in a suit challenging an ordinance adopted before July 1, 2018, does not mean the Town can do what the statute clearly prohibits—keeping in effect an ordinance based on customary use. So the Ordinance violates § 163.035, and the Court will declare it void.[4]

### b. Customary use does not apply

The next issue the Court must determine is whether customary use applies to Property Owners' properties. To prove its affirmative defense, the Town relies on the following evidence: (1) Dr. Knetsch's report, discussed above; (2) Town ordinances discussing public access points; (3) the mayor's personal knowledge of the general public's use of the beaches since 1955; and (4) a handful of historical photographs. As explained below, this evidence is insufficient to establish customary use.

---

[4] Had the Court determined that customary use applied, the parties disagree as to what the outcome of this claim should be. The Town, on one hand, argues that if the Court concluded customary use existed, then the Town had no need to pass an ordinance stating so—the public's right to use the dry sand beach simply existed. On the other hand, Property Owners claim the Ordinance could still be declared void even if there was customary use since the Town failed to follow the statute's procedures by getting a judicial declaration, although it is not clear what practical effect such a declaration would have. The Court need not resolve these issues, though, since the Court concludes recreational customary use does not apply.

The Florida Supreme Court first recognized the concept of recreational customary use of Florida's privately-owned dry sand beaches in its 1974 opinion, *City of Daytona Beach v. Tona-Rama, Inc.*, 294 So. 2d 73 (Fla. 1974). The court explained:

> The beaches of Florida are of such a character as to use and potential development as to require separate consideration from other lands with respect to the elements and consequences of title. The sandy portion of the beaches are of no use for farming, grazing, timber production, or residency— the traditional uses of land—but has served as a thoroughfare and haven for fishermen and bathers, as well as a place of recreation for the public. The interest and rights of the public to the full use of the beaches should be protected.

*Id.* at 77. Recreational customary use in the dry sand beach area landward of the MHWL exists if such recreational use of "*that particular area of the beach*" has been "ancient, reasonable, without interruption and free from dispute." *Id.* at 78 (emphasis added). The use must also be peaceable, certain, and consistent. *Trepanier v. Cty. of Volusia*, 965 So. 2d 276, 289 (Fla. Dist. Ct. App. 2007).

As a Florida appellate court later explained, "it appears to us that the acquisition of a right to use private property by custom is intensely local and anything but theoretical." *Id.* So to establish customary use, Florida courts "require proof that the general area of the beach where [owners'] property is located has customarily been put to such use and that the extent of such customary use on private property is consistent with the public's claim of right." *Id.* at 290. How that is established can vary based on the customary use asserted, but "[i]f the only source of a right claimed as 'custom,' is that a certain thing has been done in a certain way in a certain place for so long that no one can remember when it wasn't

done that way, the inability to offer evidence of the custom suggests the weakness of the claim." *Id.* at 289–90.

So here, the Town must show that the recreational uses in the Ordinance have taken place in the particular area of the beach and that such uses are ancient, reasonable, without interruption, free from dispute, peaceable, certain, and consistent. The Town's four categories of evidence listed above do not meet that burden.

Looking first to Dr. Knetsch's report, Property Owners are correct that it is deficient in two respects: (1) it does not focus on the particular area of the beach at issue in this lawsuit and (2) it does not focus on customary use of the dry sand beach landward of the MHWL. First, Dr. Knetsch's report is not limited to Property Owners' properties, or the Town, or even the areas immediately adjacent to the Town. Instead, his report examines Pinellas County beaches as a whole, looking as far south as Pass-A-Grill and as far north as Indian Rocks. The Town, as acknowledged by its corporate representative, is not a tourist destination like some of the neighboring communities, therefore consideration of recreational customary use in those other communities does not support a finding of customary use of the privately-owned dry sand beaches within the Town.

Second, Dr. Knetsch's deposition testimony indicates there was no historical recreational customary use of the Town's privately-owned beaches landward of the MHWL. For example, consider the following exchanges from Dr. Knetsch's deposition in which he discussed historical customary use:

> Q: So is it your understanding that the public's right of use historically has been limited to the shore?

A: Yes.

Q: All right.

A: Or the shore, and then if they want to go out and wade in it, that's fine.

Q: Right. Seaward of mean high water?

A: Yes.

Q: All right. And the area above mean high water, the uplands, has been subjected to private ownership in the state of Florida, has it not?

A: Yes, it has.

(Doc. 45-1, 24:14–25; 25:1).

Q: In the course of your research, are you suggesting that the public's right of use has somehow extended above the point of mean high water onto lands in Redington Beach?

A: I'm not too sure I can answer that for you, Tim.

(Doc. 45-1, 26:8–13).

Q: And, so, is it your opinion that fishing, boating, or swimming is an activity that occurs on the dry sand area of the beach?

A: Well, it all – you've got to put your belongings down somewhere. That could be on the shoreline, as we've defined it, or if the landowner permits it, they can do it on dry sand too.

(Doc. 45-1, 28:12–18). Other evidence on which Dr. Knetsch relied, such as a letter from James Schnur, the author of *Madeira Beach*, also do not support customary use of the dry sand beach, but instead reflect the public's use of the shoreline. So Dr. Knetsch's report and testimony do not establish the elements of recreational customary use.

The next evidence on which the Town relies to establish customary use are other ordinances that have been in effect for several years. For instance, § 4-9 defines "beach access point" as "[a]ny access used by the general public or private property owners for the

purpose of gaining access to the beach." (Doc. 40, p. 9). And § 6-134, which has been in effect since at least 1980, states:

> Where the public has established an accessway through private lands *to lands seaward of the mean high tide or water line by prescription, prescriptive easement or other legal means*, development or construction shall not interfere with such right of access unless a comparable alternative accessway is provided….

(Doc. 40, p. 9) (emphasis added). But neither ordinance establishes customary use. That the town has beach access points for both the public and private property owners is not in dispute given that the Town has a public, beachfront park and private residences on the beach. And the second ordinance cuts against the Town's argument for customary use since it is (1) limited to accessways to lands *seaward* of the MHWL (*i.e.*, not the dry sand beach areas *landward* of the MHWL) and (2) premised on real property law rights other than recreational customary use, such as prescription and prescriptive easements. So the Town's other ordinances weigh against a finding of recreational customary use.

As to the mayor's anecdotes about uses of the beaches when he was growing up, the Court concludes this sort of evidence is too weak to carry the Town's burden. As the *Trepanier* court cautioned, evidence that things have been done for so long that no one can remember when it was not done that way suggests a weak claim of customary use. 965 So.2d at 290. The mayor's statements are also too imprecise to establish recreational customary use of the particular area of the beach at issue since they also span into the area of North Redington Beach, where the private Tides Bath Club was located.

Finally, the Town relies on historical photographs of people using the dry sand beach area within the Town. But these photographs are unpersuasive since they were either

19

taken at the Town's public beachfront park, or the photographs lack context as to whether the people were there as invitees of the property owners.

In short, the Town failed to offer evidence establishing recreational customary use of the particular area of the beach in question.

### c. Passage of Ordinance was a facial taking of Property Owners' properties

Property Owners argue passage of the Ordinance, which gave the public the right to use the dry sand portions of their properties, amounts to a facial taking of their properties. They also argue that the public's later use of their properties, coupled with Property Owners' inability to rely on law enforcement to remove trespassers was an as-applied taking of their property. The Court agrees.

"A physical invasion constitutes a per se taking, in part because the 'power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights.' " *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 949 (11th Cir. 2018). "A taking also occurs when the government gives third parties 'a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed.' " *Id.* (quoting *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 832, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987)). And "even a temporary or intermittent invasion of private property can trigger physical takings liability." *Id.*

Here, the Town passed the Ordinance, giving the public the right to use Property Owners' properties without compensating them. Further, the Town prevented Property Owners from excluding the public from using their property by telling law enforcement not to respond to Property Owners' calls. The only defense the Town offers is customary

use, which is not viable as explained above. So the Court concludes Property Owners are entitled to partial summary judgment on their takings claim, and their damages will be determined at trial.

### d. No justification for removal of Fields from Board

Finally, Fields argues that the Town's decision to remove her from the Board because she filed this lawsuit constitutes retaliation in violation of her First Amendment rights. That her participation in this lawsuit was the sole motivating factor for Field's removal from the Board is not in dispute. The Town, though, offers multiple, conflicting arguments as to why its decision to remove Fields did not violate the First Amendment.[5]

---

[5] The Court will elaborate on some of the issues.

First, the Town in its summary judgment motion (Doc. 40, p. 21) begins by generally addressing First Amendment retaliation claims under § 1983. In doing so, though, the Town relies on case law dealing with municipalities retaliating against private citizens for protected speech—not on case law dealing with retaliation claim brought by public employees/appointees. *Compare Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) (discussing First Amendment retaliation claim brought by business owners against the county); *with Carter v. City of Melbourne, Fla.*, 731 F.3d 1161, 1168 (11th Cir. 2013) (discussing First Amendment retaliation claim brought by police officer who alleged he was fired for being active in the police union and city politics).

Second, in its summary judgment motion (Doc. 40, p. 22), the Town argues that the retaliation standard from *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) governs—which applies when a public employee suffers an adverse employment action based on party affiliation or political beliefs—instead of the standard from *Pickering v. Board of Education of Township High School District 205,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)—which applies when a public employee suffers an adverse employment action based on expressive conduct or speech. But in its response to Fields's summary judgment motion (Doc. 68), the Town argues the case of *McKinley v. Kaplan*, 262 F.3d 1146 (11th Cir. 2001)—in which the Eleventh Circuit applied the *Pickering* analysis to a public employee's First Amendment retaliation claim—is dispositive. So the Town inconsistently argues two different analyses apply to Fields's First Amendment retaliation claim in its separate filings without addressing the discrepancy.

Third, the Town argues in its summary judgment motion (Doc. 40, p. 22) that Fields's participation in this lawsuit does not constitute speech on a matter of public concern, but the Town concedes

After a careful review, the Court concludes the Town violated Fields's First Amendment rights by removing her from the Board.

While a municipality "may not demote or discharge a public employee in retaliation for speech protected under the first amendment, a public employee's right to freedom of speech is not absolute." *Carter v. City of Melbourne, Fla.*, 731 F.3d 1161, 1168 (11th Cir. 2013) (citing *Bryson v. City of Waycross,* 888 F.2d 1562, 1565 (11th Cir. 1989)); *see also McKinley v. Kaplan*, 262 F.3d 1146, 1149 n.5 (11th Cir. 2001) (applying the same analysis to unpaid political appointees as traditional salaried public employees). Rather,

> the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering v. Bd. of Ed.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

A public employee's First Amendment retaliation claim is governed by a four-step analysis:

> First, we consider whether Plaintiff's speech was made as a citizen and whether it implicated "a matter of public concern." If this first threshold requirement is satisfied, we then weigh Plaintiff's First Amendment interests against the City's interest in regulating his speech to promote "the efficiency of the public services it performs through its employees." The above two issues are questions of law that are decided by the court. The court's

---

that Fields's participation in this lawsuit constitutes speech on a matter of public concern in its response to Fields's summary judgment motion (Doc. 68, pp. 13–15) by applying the second prong of the *Pickering* analysis.

Needless to say, the Town's failure to consistently apply the correct law or to take consistent positions in its filings has made the Court's job more difficult.

resolution determines whether Plaintiff's speech is protected by the First Amendment.

If his speech is so protected, the third stage of the analysis requires Plaintiff to show that it was a substantial motivating factor in his termination. If Plaintiff is able to make this showing, the burden shifts to the City to prove that it would have terminated Plaintiff even in the absence of his speech. Because these final two issues, which address the causal link between Plaintiff's speech and his termination, are questions of fact, a jury resolves them unless the evidence is undisputed.

*Moss v. City of Pembroke Pines*, 782 F.3d 613, 617–18 (11th Cir. 2015) (internal citations omitted). When considering the second step, courts consider "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Snipes v. Volusia Cty.*, 704 F. App'x 848, 852 (11th Cir. 2017) (quoting *Morales v. Stierheim*, 848 F.2d 1145, 1149 (11th Cir. 1988)).

Here, only the second step is at issue since the Town conceded in its response to Fields's summary judgment motion that participation in this lawsuit is speech as a private citizen on a matter of public concern (step one),[6] that her participation in this lawsuit was the sole motivating factor behind her removal from the Board (step three),[7] and that the Town would not have removed her from the Board for any other reason (step four).

---

[6] Although the Court concludes the Town abandoned its arguments that Fields was not speaking on a matter of public concern, the Court would have concluded the first step was satisfied even if this issue was in dispute since Fields's participation in the lawsuit does not "owe[] its existence to [her] professional responsibilities." *Carollo v. Boria*, 833 F.3d 1322, 1329 (11th Cir. 2016) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)).

[7] The Town also takes conflicting position on this issue. In its response to Fields's summary judgment motion, the Town appears to concede—or at the very least does not dispute—that she was removed from the Board. (Doc. 68, pp. 12–15). But in its summary judgment motion (Doc. 40, p. 22), the Town argues it did not remove her from the Board because she voluntarily resigned.

Turning to the balancing test in the second step, the Court concludes the Town has not shown its interest in regulating Fields's speech outweighs her First Amendment interests. First, the Town has not shown there was a reasonable possibility that Fields's lawsuit would affect the Town's ability to perform its duties efficiently or somehow cause a disruption. *See generally Snipes*, 704 F. App'x at 852 (explaining that a reasonable possibility of adverse harm in the form decreased efficiency or a disruption is all a government must show). Second, there is no evidence that Fields's speech, in the form of a lawsuit, was taking away from her time working on the Board, that it took place on the Town's property, or that her manner of the speech was offensive or vulgar. Third, the Town points to nothing about the context of Fields's protected speech that would warrant the Town removing her from the Board. In fact, the only record evidence shows there were no complaints about Fields's performance on the Board—either before or after this lawsuit was filed—and there is no evidence indicating Fields's protected speech affected the Town's operations. *See Carter*, 731 F.3d at 1170 (concluding the *Pickering* balancing test weighed in favor of the public employee where "the defendants have not pointed to any way in which Carter's speech threatened the municipality's ability to maintain the orderly administration of public services."). As such, the Court concludes the *Pickering* balancing

---

But it is undisputed that Fields refused to offer her resignation in writing and the Commission then unanimously voted to remove Fields from the Board. So the Court concludes the undisputed record evidence does not support the Town's argument in its summary judgment motion that Fields voluntarily resigned from the Board.

test weighs in favor of Fields's First Amendment interests, and Fields is entitled to summary judgment on her retaliation claim.

Accordingly, it is ORDERED AND ADJUDGED that:

1. Plaintiffs' Motion to Exclude Testimony of Defendant's Putative Expert Dr. Joe Knetsch (Doc. 46) is GRANTED IN PART and DENIED IN PART.

2. Defendant Town of Redington Beach's Motion for Summary Judgment (Doc. 40) is DENIED.

3. Plaintiffs' Motion for Final Summary judgment as to Counts I and IV and Partial Summary Judgment as to Counts II and III (Doc. 63) is GRANTED.

4. Plaintiffs' Motion to Strike Affidavit of Joe Knetsch (Doc. 71) is GRANTED.

5. The Court declares as follows:

   - The Town of Redington Beach's Ordinance 2018-03 is void in violation of § 163.035, Florida Statutes;

   - The Town of Redington Beach violated Plaintiff Wendy Fields's First and Fourteenth Amendment rights under the U.S. Constitution by removing her from her volunteer position on the Board of Adjustment.

6. Defendant the Town of Redington Beach is enjoined from violating Plaintiff Wendy Fields's First and Fourteenth Amendment rights under the U.S. Constitution by removing her from her voluntary position on the Board of Adjustment based on her filing of the instant lawsuit.

**DONE** and **ORDERED** in Tampa, Florida, this 19th day of February, 2020.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record