UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SHAWN BUENDING, ROBERT
DOHMEN, THOMAS K. BROWN,
HARRY S. FIELDS, WENDY
FIELDS, SHAWN MOORE and
DAGMAR MOORE,

Plaintiffs,

v.                              Case No: 8:19-cv-1473-VMC-SPF

TOWN OF REDINGTON BEACH, a
Florida municipal corporation,

Defendant.

AND

PAMELA GREACEN and
ARTHUR L. BUSER, JR.

    Plaintiffs,

v.                              Case No. 8:20-cv-2568-VMC-AAS

TOWN OF REDINGTON BEACH,

    Defendant.
_____/

## MEMORANDUM OF DECISION

    This cause came on for bench trial beginning on April 8, 2024. Pursuant to Fed. R. Civ. P. 52(a)(1), the Court makes the following findings of fact and conclusions of law.

I.    **Procedural History**

The complaint in Buending, et al. v Town of Redington Beach was originally filed in state court on June 21, 2019, and removed to federal court on June 24, 2019, being assigned case number 8:19-cv-1473-JSM-SPF. The Complaint in Pamela Greacen, and Arthur L. Buser, Jr. v. Town of Redington Beach was originally filed in state court on October 28, 2018. On October 30, 2020, Plaintiffs in the Greacen case filed an Amended Complaint asserting federal claims. That action was subsequently removed to federal court on November 3, 2020, and assigned case number 8:20-cv-2568-JSM-AAS.

On February 19, 2020, the predecessor judge entered an order (Doc. # 74) in the Buending case, granting summary judgment to those Plaintiffs. The Town appealed and on August 20, 2021, the Court of Appeals vacated the summary judgment order in Buending and remanded the case for a trial. Buending v. Town of Redington Beach, 10 F.4th 1125 (11th Cir. 2021).

On November 18, 2021, the predecessor judge consolidated the Greacen and Buending cases "to the extent that the cases will be tried together as a bench trial." (Greacen Doc. # 30). On November 15, 2022, the predecessor judge recused himself from the procedurally consolidated cases. (Buending Doc. # 140). The consolidated cases were subsequently

reassigned to this Court.

## II.  **Plaintiffs' Claims**

Of the claims remaining for trial, Plaintiffs all claim that Ordinance 2018-03 of the Town of Redington Beach is a facial and as-applied taking. In addition, Plaintiff Wendy Fields claims that she was removed from service on the Town's Board of Adjustment ("BOA"), and that this removal constituted First Amendment retaliation. As to the Takings Clause claims, the Town asserts the affirmative defense of customary use.

## III. **Findings of Fact**

In the 1920s, before it had its own name and borders, the land that now includes Redington Beach began being bought by an Indiana businessman named Charles Redington. The land was initially referred to as the Redington Beaches. In 1935, Mr. Redington built the first home on what is now Redington Beach.[1] T IV-84, 88. According to the testimony of Dr. Joe Knetsch, the historian retained by the Town, the Redington Beaches did not have connectivity to the mainland until other investors built a wooden bridge in the mid-1920s. Id. at 85.

---

[1] Where the Court cites to the trial transcript it will designate the cite with a "T" followed by the volume number in roman numeral followed by the page number.

In 1945, the Town of Redington Beach became incorporated as a municipality. Id. at 88. Early Pinellas County Commission meeting minutes reflect that the County Commission adopted an ordinance to prohibit driving cars on the beach in Redington Beach. Among other things, the ordinance references the "safety of beachgoers." Id. at 87.

Dr. Knetsch testified that his research of Town Commission meeting minutes from the beginning of the Town revealed that at the very first meeting of the Town Commission, "Commissioners were discussing the fact that Charles Redington was going to donate certain parcels of land to the Town to ensure that there would be beach access," and the establishment of a "beach access committee." T IV-89-90. The Town is entirely residential and, but for several condominium buildings at the very north end of the Town, it features single-family homes. T I-34. The Town has approximately 1,400 residences and is a little over a mile long. T IV-141. The Town owns a small vacant residential lot on the beach called Beach Park which is approximately 80 feet wide. Otherwise, the beach in the Town is under private ownership. T IV-149.

Plaintiffs own beachfront residential lots in the Town fronting the Gulf of Mexico. Their ownership extends to the

mean high-water line ("MHWL"). Pamela Greacen and Arthur Buser purchased their home at 16120 Gulf Blvd. in 2011. T I-27. Wendy and Harry Fields purchased a home at 15810 Gulf Blvd. in 2004. T II-184. In 2017, Thomas Brown purchased a home at 15802 Gulf Blvd. Shawn and Dagmar Moore purchased a home at 15912 Gulf Blvd. in 2017. Adjacent to the Moores' former home in the Town is the previously mentioned Beach Park, which consists of a parking lot leading to the beach. In June 2018, Shawn Buending and Robert Dohmen purchased a home at 15808 Gulf Blvd.

On June 6, 2018, the Town of Redington Beach, Florida, passed Ordinance 2018-003, which became effective on that date. The Ordinance created § 13-30 of the Town Code, subsection (a) of which provided "[t]he public's long-standing customary use of the dry sand areas of all of the beaches in the town for recreational purposes is hereby recognized and protected." The Ordinance went on to set forth a list of traditional beach activities which were prohibited from being "impeded or interfered with" by anyone (including the owners of the private segments of the beach). The Ordinance provided that the rights being recognized derived from the doctrine of customary use.

At trial, the Town provided a range of documentary evidence and witness testimony[2] supporting its customary use defense. As the exordial clauses to the Ordinance confirm, Charles Redington founded the Town in 1935 and donated beach access points, which have existed since the Town's inception. There are five such access points. T I-109. These access points, in the form of boardwalks, are repaired and maintained by the Town. The Town code, in turn, defines a "beach access point" as "[a]ny access *used by the general public or private property owners* for the purpose of gaining access to the beach." Town Code § 4-9(b) (emphasis added). Of course, the beach access points could, as is argued by Plaintiffs, be consistent merely with the use of the wet sand. However, additional evidence supports the Town's assertion of customary use of the dry sand beach.

For one, the Town proved that it has raked the entire length of the beach in the Town for decades. Many of the Plaintiffs contended that the Town did not begin raking the beach until 2019 after they filed their suits, and that they

---

[2] While the Town had proposed to call over 80 witnesses (Doc. # 138), during the pre-trial conference the Court, exercising its authority to manage the trial, limited the Town to thirty witnesses. T I-19. Although the Court found all of the Town's witnesses credible, the Court will not summarize the testimony of each witness here.

pay for their own private raking service. But several Town officials and witnesses testified raking has occurred for decades. For instance, Mayor Will testified that the Town has raked the beach since he moved into the Town in 1992. T IV-151. He also testified that Town records confirm that the Town has owned a tractor since the 1970s and that one of the primary duties of the Town's long-serving maintenance employee was to rake the beach with the Town tractor. Id. at 152, 154. Plaintiff Greacen even admitted that not all beachfront residents use a private raking service, estimating that the portion who do may be under 50%. T I-40. It can also not be argued that the Town's raking was only confined to the beach below the MHWL because, as Plaintiff Gracean confirms, some residents complained that the Town's rake had disturbed vegetation planted by owners near their seawalls. T I-89, 91. It stands to reason that, if the Town believed the beach to be private, it would not expend tax dollars paid by all Town residents to maintain a beach only a handful of residents would use.

The Town also provided extensive and consistent witness testimony of the use of the "dry sand" beach in the Town.[3]

---

[3] The parties disputed terminology at trial, but the Town's witnesses were all asked by the Town's counsel to confine

For instance, Barry Scarr testified that he first moved to a non-beachfront home in the Town as a child in 1956. He then went off to college in 1972, but returned in 1986. T III-63. Back when Mr. Scarr's parents bought their home, their home (on the land side of Gulf Blvd.) faced the Gulf of Mexico and "the beach was everything." T III-66. Mr. Scarr testified that the beach is where he played as a child. He and his friends walked and sunbathed on the beach. When he went to high school, he continued such uses. His friends, some who lived on the Pinellas County mainland, would come to his house and the group of friends would set out to the beach. Id. at 66-67. Mr. Scarr also confirmed that when his parent's relatives and friends visited, they would go to the beach as well. Id. Young Mr. Scarr would throw a frisbee, toss a football, and get under an umbrella and socialize at least weekly. Id. at 67.

---

their testimony to that portion of the sand waterward of the owners' seawalls and where the "wet sand" began. Since the Plaintiffs all admitted that they could not determine where the MHWL was without a survey (see, for instance, T I-87, T II-232), and no party submitted a survey depicting that line, the Court will not attempt to determine where Plaintiffs' property lines end along the Gulf of Mexico. To resolve the question of customary use in this case, that precise determination is not necessary since, if the beach is beyond the MHWL, then it is open for public use as sovereign lands anyway.

Mr. Scarr and his wife had children who were raised on the beach. He testified "our kids loved beaching, swimming. A lot of sandcastles. A lot of, again, sports, playing, throwing. Just enjoying the whole beach some with our kids." T III-68. Mr. Scarr testified that his children were born in 1978 and 1980, and that "both kids . . . would have a lot of friends go down [to the beach] because they'd end up at our place first, and then they would be heading down to the beach." Id. at 76.

Mr. Scarr is now into his third generation of family members who make use of the beach in the Town:

> When we first moved down there, it was my parents' friends and my sisters and brothers, older folks that lived in Canada. That was their whole thing was to get to the beach. . . . And then as I grew up, it became my friends, and then my kids, and now my grandkids.

T III-77.

Mr. Scarr also witnessed others using the beach. He confirmed, for instance, that he witnessed various events such as holiday events, memorials, and weddings "in the dry sand." T III-70. He also confirmed there were events organized by the Property Owners Association ("POA"). Id. at 71. He confirmed that these events were "annual" and that they often drew "hundreds" of residents. Id. at 72. He noted, "I see people sitting out on the beach all the time . . . with

9

umbrellas or not, or people fishing, or just . . . sitting on the beach and getting a tan. And there's swimming too." T III-73. He testified that he sees people fishing "every time I go to the beach. I don't know what they're catching, but they're there." T III-78.

The Court also received testimony from Mr. Scarr's now adult daughter, Kelly Scarr Johnson. She confirmed she moved to the Town with her parents when she was five years old, and lived there through college. T III-103. She testified that her first memories of using the beach on her own was when she was about 10 years old. During summers, she took her bike to the beach "almost every day", and she and her best friend would lay out and "look at all the houses." Id. at 104. She confirmed that while she would gain access to the beach via one of the beach access points, she would move up or down the beach behind the homes to "find a place where there aren't a lot of people." Id. at 105. If the portions of the beach right adjacent to the beach access points would get full, others who arrived would tend to move down the beach to a less populated spot. Id. at 107. She also confirmed that while she was in school, she was on the swim team, and her coach made the team go to Redington Beach and run in the dry sand for a workout. Id. at 111.

Mrs. Scarr Johnson also confirmed that she now has children of her own, and that she regularly brings them to Redington Beach. T III-108. In fact, she confirms her kids visit the beach "probably even more than I ever went myself. They're 10 and 12 right now." Id. at 109. They are regular visitors on Mother's Day, having been there eight of the last ten such days. Id. They are also there during spring break. Id.

The Court also received testimony from Barry Steagall. Mr. Steagall moved to the Town in the summer of 1981 and has lived there for 43 years. T III-30-31. Mr. Steagall testified that he and his then-wife selected a home in Redington Beach that was not on the beach. However, he and his wife "went to the beach a lot" and that the Town afforded him access to the beach. T III-31. He confirmed that he would regularly take lunches to the beach, swim at the beach, and take umbrellas to the beach. Id. He also confirmed that his friends would make similar uses of the beach, and that "it was just a friendly group of people." Id. He confirmed that the beach would be fuller on weekends, and that in the mornings, "you would see the elderly people walking on the beach." Id. His own uses included jogging on the beach probably five days a week." Id. He noted there are "a lot of young couples and

they bring their kids there." Id. Mr. Steagall also confirmed that he witnessed other members of the public using the dry sand area of the beach "all the time." T III-34. He noted that "people picnicked on that beach. There have been funeral sermons on that beach. We have cookouts on the beach, the 4th of July, and it's not in front of Beach Park, it's usually a couple houses down." Id. He also confirmed there have been weddings on the beach, and "there are kids surfboarding out there," and that "each night you see the families walk out and they enjoy the sunsets all up and down Redington Beach." Id.

Mrs. Katherine Steagall also testified. She has lived in the Town for thirty-four years, and she testified that she has many relatives all over the world, including from Taiwan, Spain, Charlotte North Carolina, Orlando, and closer in the cities of Venice, Seminole, and St. Petersburg. She noted that over the years, these family members would "gather at our house, which was very desirable for everyone that lived inland [because] we would go down to the beach. And I had children and grandchildren that I took to the beach with us." T III-121. She confirmed that activities included frisbee, volleyball, taking pictures, and sunbathing.

12

Cameron Bradbeer testified that he grew up on Redington Beach, living in his parent's home in Town since he was born in 1984. T IV-18-19. When he was young, his parents would take him and his brother to the beach. Neighbors would often join. They would build sandcastles. Id. at 19. He testified that he now has two nieces and that his family takes them to the beach in Redington Beach. They build sandcastles, fly kites, and swim. Id. at 20. According to Bradbeer, no one has ever approached him or his family and asked them to leave or told them they were trespassing. Id. He testified, "I always believed that the dry sand was public – you know, it was public beach and public access, like anywhere else in Pinellas County." Id. at 24.

The Town's current Mayor, David Will, testified that he has lived in the Town since 1992 (thirty-two years). He also raised his son (born in 1995) on the beach. T IV-139-40. Mayor Will's personal uses of the beach as a younger man included socializing with friends, throwing a frisbee, fishing, playing paddleball, and sunbathing. Id. at 140. After having a child, Mayor Will's beach uses included chasing birds, making sandcastles, picnicking, and boogie boarding up and down the beach. Id. at 143, 145. His uses of the beach have been consistent over the decades he has lived in the Town,

and he or his family have used the beach "probably five days a week." Id. at 144.

Even Plaintiff Greacen admitted that residents "come, sit down . . . tan . . . go for a swim, and . . . go home." T I-46. Residents also surf when there is a "really big storm day." Id. at 45.

The Town also established that there have been a variety of annual events conducted, at least in part, on the privately-owned portions of the dry sand beach. For instance, the long-serving former president of the POA testified that residents would have an annual cookout on Independence Day, and there would be one or two beach cleanup days a year sponsored by the POA. Plaintiff Gracean acknowledged knowing about these organized clean up days. T I-96.

Mrs. Steagall confirmed that she has:

> been to Redington Beach property association functions there. I've been to bonfires, family gatherings. We've even had ceremonies for people that have passed away in the community where we're honoring all of them. And there are many, many people that turn out for those events also.

T III-124.

Mr. Kenneth Sulewski also testified. He has been a Town resident for over 25 years. T III-133. In addition to being

14

a resident, he was president of the POA between 2013 and 2020. He confirmed that,

> during that time, we had two official events taking place on the dry sand. One was a beach party, usually in May or the 4th of July . . . where we would set up a barbecue and food tent, and we'd cook hotdogs for our group and for anyone walking the beach. Secondly, every 5th of July, we would organize a beach cleanup only on the dry sand. And we'd walk the entire length of Redington Beach picking up all the debris left over from the previous night's fireworks. . . . And we cleaned from the dry sand to their seawall, to their property line, what I consider their property line.

Id. at 135. Mr. Sulewski confirmed that while the POA coordinated with one of the homeowners:

> Everything else was in the sand in front of [the private homes]. We didn't ask their permission. We just held that every year, and we had no complaints from the neighbor whose house we stood in front of or any other neighbors.

Id. at 137. He confirmed that these events drew "at least a hundred" attendees and that they were an annual event for at least 24 years. Id. at 137–138. When asked if homeowners came out to complain, Mr. Sulewski responded, "They came out and wanted a hot dog, which we provided." Id. at 135.

Mr. Sulewski also had his own personal uses of the beach during his time living in the Town. For instance, he met his wife on the beach in Redington Beach at a gathering of other residents on the dry sand behind a private residence. Id. at 138.

As to the use of the beach by those other than Town residents, the evidence did not show that the small beach in the Town attracted throngs of visitors. Still, the Town did establish that certain classes of non-residents have made historical use of the beach. For instance, Plaintiff Gracean admitted that a property in the Town called the Royal Orleans was "a series of little cottages on the east side of Gulf Blvd [and that] they are grandfathered in for a vacation rental." T I-92. Gracean also confirmed that there are other single-family homes and condo units which are listed on VRBO and Airbnb as vacation rentals. T I-93. She confirmed that these non-resident visitors would have places to park during their stays given parking provided at the rental properties. T I-100. All of this evidence suggests there are customs, housing, and parking supporting visitors' use of the beaches.

Plaintiff Wendy Fields was appointed to the Town's BOA, which reviews requests for variances from the Town's zoning code, in March of 2017. The position is not a Town employment position and was "totally volunteer." T II-204-205. After the Buending lawsuit (in which Mrs. Fields was a Plaintiff) was filed, concern was raised over her continued service on the BOA. Specifically, at a Town Commission meeting on September 4, 2019, then-Commissioner (now-Mayor) David Will "noted that

a resident on the [BOA] has a lawsuit filed against the Town and believes that this affects all of the residents, and it is a conflict of interest." T II-209. According to then-Commissioner Will, "this had been brought to my attention by one of the residents, and I thought, well, maybe this is something that needs to be discussed." T IV-171. According to Mrs. Fields, who was in the audience at the meeting, the Town Attorney advised the Commission that the Town Code provided that the Commission had "the discretion to remove a person [from a Town board] if it is in the Town's best interests." Id.

Then-Mayor Nick Simons asked Mrs. Fields if she would like to speak on her behalf. Mrs. Fields testified that in response, she informed the Commission "if the Commission wanted me to resign, then I would resign if they felt there was a conflict of interest." T II-209-210. According to Mrs. Fields, Mayor Simons then polled each member of the Commission, and all five noted a desire for Mrs. Fields to resign. Id. at 210. Mayor Simons then stated "Mrs. Fields," to which Mrs. Fields responded "okay." T II-227. As Mrs. Fields was leaving, the Mayor asked Mrs. Fields to put her resignation in writing. After consulting with her lawyer, Ms. Fields refused to submit her resignation in writing. At the

17

Commission's next meeting, the Mayor called for a vote to remove Mrs. Fields from the BOA, which passed unanimously. Plaintiffs then amended the complaint to include Ms. Fields's claim for First Amendment retaliation.

## IV.   Conclusions of Law

### A.   Facial Taking

The Town contended in its pre-trial submissions that considering the Eleventh Circuit's Buending opinion (vacating the summary judgment order which had conflated the facial and as-applied takings questions), the only takings issue to be tried was the as-applied claim, and the Town's affirmative defense of customary use. Nevertheless, inasmuch as the Eleventh Circuit's Buending opinion did not separately address the facial takings claim, the Court has determined that issue remains to be decided.

A facial challenge seeks to invalidate the legislation itself and is the most difficult challenge to mount successfully because it requires a plaintiff to show that no set of circumstances exists under which the law would be valid. United States v. Ruggiero, 291 F.3d 1281, 1285 (11th Cir. 2015). The Florida Supreme Court agrees that "[t]o succeed on a facial challenge, the challenger must demonstrate that no set of circumstances exists in which the

18

statute can be constitutionally valid." <u>Fraternal Order of Police, Miami Lodge 20 v. City of Miami</u>, 243 So. 3d 894, 897 (Fla. 2018).

The "no set of circumstances" standard (often referred to as the <u>Salerno</u> rule) has been clarified by the Eleventh Circuit, which has noted that "the question that <u>Salerno</u> requires us to answer is whether the statute fails the relevant constitutional test." <u>Club Madonna Inc. v. City of Miami Beach</u>, 42 F.4th 1231, 1256 (11th Cir. 2022); <u>see also Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.</u>, 89 F.4th 1337, 1350 (11th Cir. 2024) (identifying the relevant constitutional standard and determining whether the challenged provision at issue failed the test).

Thus, the facial challenge to some extent merges into the as-applied challenge. Nevertheless, the Court will address the facial challenge separately as it was separately pled by Plaintiffs. As to that challenge, on motion of the Town, the predecessor judge clarified the summary judgment order by confirming his opinion that the Town's Ordinance was facially unconstitutional on June 6, 2018, the very day it was adopted. (<u>Buending</u> Doc. ## 78, 81). The ensuing opinion of the Eleventh Circuit not only vacated that finding but remanded the case for trial to allow the Town to establish

19

customary use. <u>Buending</u>, 10 F.4th at 1135. The Town argues that the Eleventh Circuit would not have vacated the summary judgment order remanding the case to allow the Town to establish customary use if it had agreed with the order's conclusion that the Ordinance was facially unconstitutional.

Nevertheless, the Court must identify the relevant constitutional standard and determine whether the challenged provision at issue fails the test. In this case, the Court looks to the Takings Clause, which provides that government shall not take private property for public use without just compensation. The Ordinance does not purport to "take" the portion of dry sand beach in the Town owned by Plaintiffs. Rather, it purports to recognize and protect the customary use rights of those residents who have gained, through custom, the right to make certain uses of that privately-owned beach.

The Eleventh Circuit's <u>Buending</u> opinion recognized that under Florida law, if customary use is factually established, there would be no taking:

> In <u>Reynolds v. County of Volusia</u>, 659 So. 2d 1186 (Fla. 5th DCA 1995), the Fifth District Court of Appeal noted that "the doctrine of customary usage of the sandy beach areas of this state offer[ed] a potential . . . ground" to affirm the ruling that there was no taking in the case. <u>Id.</u> at 1190–91. The Fifth District Court of Appeal reiterated the requirements of the customary use doctrine, explaining that it "requires the courts to ascertain in each case the degree of customary and

ancient use the beach has been subjected to and, in addition, to balance whether the proposed use of the land by the fee owners will interfere with such use enjoyed by the public in the past." Id. at 1190.

Buending, 10 F.4th at 1132. In Trepanier v. County of Volusia, 965 So. 2d 276 (Fla. 5th DCA 2007), the court addressed the question of whether an application of the customary use doctrine would affect a facial taking:

> Finally, we agree with the trial court's analysis of the "takings" issue. *If the law recognizes that the public has a customary right* to drive and park on Appellants' property as an adjunct of its right to other recreational uses of that property, as recognized in Tona-Rama, then *no takings claim can be made out*.

Id. at 298 (emphasis added); see also Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1027 (1992) (the state may resist payment of compensation "if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with.").

Inasmuch as the question of what property rights are at issue in a takings claim are driven by state, not federal law, the Court notes that Florida law expressly recognizes and allows for persons to gain a right of customary use over privately-owned property. This right was first recognized as being part of Florida law by the Florida Supreme Court in City of Daytona Beach v. Tona-Rama, Inc., 294 So. 2d 73 (Fla.

21

1974), which adopted the doctrine of customary use into Florida property law. Thereafter, it became part of the background principles of Florida property law. The Court agrees with the Town's argument that it would be illogical for this Court to conclude that the Florida Supreme Court would have adopted a doctrine of property law (and indeed apply that doctrine in the case to allow citizens to continue accessing the beach at issue), if that doctrine would constitute a facial taking.

The Court also notes that the Florida Legislature in 2018 adopted the doctrine of customary use into the Florida Statutes via the adoption of Florida Statute § 163.035.[4] That statute allows customary use ordinances adopted during the time the Town's Ordinance came into effect to stand but, if challenged, requires the jurisdiction to establish the doctrine applies over the relevant beach area via an affirmative defense. The Court also agrees that it would not be logical for the Florida Legislature to adopt a statutory

---

[4] The Court acknowledges that the Florida Second District Court of Appeal has ruled that this statutory provision (allowing an affirmative defense to a customary use challenge) applies to the Town's Ordinance in a pending action in state court also challenging the Ordinance under state takings law. See Dirty Duck 16004 LLC v. Town of Redington Beach, 376 So.3d 774 (Fla. 2d DCA 2023).

scheme regarding local customary use regulations in the state if such local customary use regulations were facial takings under state law on the very day they are adopted.

Finally, the Town's pre-trial brief aptly noted an order in the state court case <u>Dirty Duck 16004 LLC, et al. v. Redington Beach</u>, Case No. 21-3526-CI-19, pending in the Sixth Circuit Court for Pinellas County. That case also challenges the Defendant's Ordinance on takings grounds. The Court notes that in its February 3, 2023 order granting defendant's dispositive motion for judgment on the pleadings as to Counts I, II, III, IV, and VII of plaintiffs' amended complaint, the Circuit Court Judge ruled, as to Count IV in that litigation (a facial takings claim regarding the Ordinance) that the Ordinance was not facially unconstitutional, and therefore the Circuit Court granted judgment to the Town as to that count. While the opinion of a state trial court has no binding precedential effect on this Court, the Court acknowledges and finds persuasive the order analyzing the same Ordinance which is at issue in these consolidated cases.

In light of the foregoing, the Court finds that the adoption of the Town's Ordinance did not effect a facial violation of the state or federal Takings Clauses because the protection and regulation of customary use of private

23

property in Florida is authorized and, when the underlying customary uses are proven, such protection or regulation does not constitute a taking. As the controlling Florida authority confirms: "If the law recognizes that the public has a customary right to [make certain uses of] Appellants' property as an adjunct of its right to other recreational uses of that property, as recognized in Tona-Rama, then no takings claim can be made out." Trepanier, 965 So. 2d at 298.

### B.   As-Applied Taking & Customary Use Defense

Florida Statute § 163.035(4) authorizes a local government customary use ordinance adopted between January 2, 2016, and July 1, 2018, to continue in effect but, "in any proceeding challenging" the ordinance, the local government may "rais[e] customary use as an affirmative defense." Fla. Stat. § 163.035(4). Plaintiffs' consolidated cases make such a challenge, and the Town asserted customary use as an affirmative defense in response. The Town therefore bears the burden of proof as to its affirmative defense.

### 1.   Standard of Proof

Prior to discussing the merits of the Town's defense, the Court will address the correct standard of proof, as this was disputed by the parties at the pre-trial stage. While Plaintiffs argued that the Town's evidentiary standard should

24

be a heightened standard, it did not cite to the Court any controlling authority placing that burden on the Town. The Town, for its part, argues that its affirmative defense of customary use must be proven by the preponderance of the evidence. "A preponderance of the evidence is evidence which is more convincing than the evidence offered in opposition to it." Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 137 n.9 (1997) (quoting Greenwich Collieries v. Dir., OWCP, 990 F.2d 730, 736 (3d Cir. 1993)) (cleaned up). It "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." Concrete Pipe, 508 U.S. at 622 (quotation marks omitted). Alternatively phrased, it is proof that persuades the trier of fact that a proposition "is more likely true than not true." United States v. Deleveaux, 205 F.3d 1292, 1296 n.3 (11th Cir. 2000) (quoting a jury instruction that was upheld); see also 11th Cir. Pattern Civ. Jury Instr. 1.1 (stating that the standard of proof by a preponderance of the evidence means the party with the burden "must prove that, in light of all the evidence, what [that party] claims is more likely true than not").

Constitutional claims raised by way of 42 U.S.C. § 1983 (including takings claims) are routinely analyzed under this standard. The Court has not independently found any

controlling authority holding that another standard of proof applies as to customary use. Thus, the Court applies the preponderance of the evidence standard.[5]

### 2.   Florida Law on Customary Use

Whether the Town may maintain its Ordinance recognizing and regulating the pre-existing rights of Town residents and visitors to make certain recreational uses of the privately-owned portions of dry sand beach turns on whether the Town established at trial that such uses have been "ancient, reasonable, without interruption and free from dispute, [so that] such use, as a matter of custom, should not be interfered with by the owner." Tona-Rama, 294 So. 2d at 78.

As the Eleventh Circuit noted in Buending, while the Plaintiffs purchased their respective properties for substantial sums, they, "of course, made these purchases against the backdrop of state property law principles." Buending, 10 F.4th at 1128. There is no federal law of property. Therefore, to resolve whether Plaintiffs have a property interest which has been "taken" and whether the Town has shown customary use over the dry sand beach in dispute,

---

[5] Even if a more stringent "clear and convincing" evidence standard applied, the Court would still find that the Town had proved their customary use defense.

the Court must look to Florida law. See Lucas, 505 U.S. at 1030 (noting that the federal courts must resort to "existing rules or understandings that stem from an independent source such as state law" to define the range of interests that qualify for protection as "property" under the Fifth and Fourteenth Amendments). As the Buending court also noted: "To resolve whether the Town has shown customary use over the dry sand beach in dispute, we look to Florida law." Buending, 10 F.4th at 1131.

The Florida Constitution gives the public a right of access along the beaches and shorelines of the state, below the "mean high water line[]" Fla. Const. art. X, § 11. The Eleventh Circuit characterized this area as "otherwise known as the wet sand beach." Buending, 10 F.4th at 1128. Florida Statute § 187.201(8)(b)(2) also recognizes the public's reasonable access to beaches, stating as part of the State Comprehensive Plan that it is a state goal to "[e]nsure the public's right to reasonable access to beaches." Fla. Stat. § 187.201(8)(b)(2). As noted, Florida law also recognizes customary use. Customary use finds its origins in English common law. William Blackstone described the "unwritten laws of England," including the "particular customs, or laws which affect only the inhabitants of particular districts." 1

William Blackstone, Commentaries on the Laws of England, at *74. This was reflected in court decisions recognizing that, for instance, the inhabitants of a parish could place a maypole on another's property and dance around it, Hall v. Nottingham, 1 Ex. D. 1 (Eng. 1875), and that parish inhabitants could play games and sports on another's property because of established custom, Fitch v. Rawling, 2 H. Bl. 393, 126 Eng. Rep. 614 (C.P. 1795). English common law has long recognized use of another's property based on longstanding customs.

The customary use at issue in these consolidated cases is the public's access to the Town's dry sand beaches to engage in the activities enumerated in the Ordinance. The Florida Supreme Court first articulated the customary use doctrine in 1974. Tona-Rama, 294 So. 2d at 78. In Tona-Rama, the Florida Supreme Court explained that the public could continue using the dry sand area adjoining a tourist attraction if such recreational use were "ancient, reasonable, without interruption and free from dispute." Id. In describing the rationale underlying customary use, the Florida Supreme Court wrote:

> No part of Florida is more exclusively hers, nor more properly utilized by her people than her beaches. And the right of the public of access to, and enjoyment of,

> Florida's oceans and beaches has long been recognized by
> this Court. . . . The beaches of Florida are of such a
> character as to use and potential development as to
> require separate consideration from other lands with
> respect to the elements and consequences of title. The
> sandy portion of the beaches are of no use for farming,
> grazing, timber production, or residency—the traditional
> uses of land—but has served as a thoroughfare and haven
> for fishermen and bathers, as well as a place of
> recreation for the public. The interest and rights of
> the public to the full use of the beaches should be
> protected.

Id. at 75, 77. Thus, Florida law allows for localities to

recognize the public's customary use of their beaches under

the English common law tradition of the doctrine.

Florida's intermediate appellate courts have also

addressed the doctrine after Tona-Rama. In Reynolds v. County

of Volusia, 659 So. 2d 1186 (Fla. 5th DCA 1995), the Fifth

District Court of Appeal noted that "the doctrine of customary

usage of the sandy beach areas of this state offer[ed] a

potential . . . ground" to affirm the ruling that there was

no taking in the case. Id. at 1190-91. The Reynolds court

reiterated the requirements of the customary use doctrine,

explaining that it "requires the courts to ascertain in each

case the degree of customary and ancient use the beach has

been subjected to and, in addition, to balance whether the

proposed use of the land by the fee owners will interfere

with such use enjoyed by the public in the past." Id. at 1190.

But because it determined the title at issue did not include the dry sand beach, the court did not have to reach the issue of whether customary use existed in the case. Id. at 1190–91.

Later, in Trepanier, the Fifth DCA again addressed the customary use doctrine. 965 So. 2d at 290. In that case, the court indicated that to establish a customary right the local government need not prove customary use of the property owners' specific parcels of property. Id. Instead, the court read Tona-Rama to "require proof that the general area of the beach where [the private] property is located has customarily been put to such use." Id. (emphasis added). Therefore, in these consolidated cases, the Town did not have the burden of proving that the public specifically made customary use of each privately-owned parcel of beach in the Town. As the Buending court observed:

> Recall that the Town has a total area of only 1.3 square miles, 0.4 square miles of which is land and 0.9 square miles is water. The question of customary use is a localized inquiry, in this case implicating fairly limited stretches of beachfront. The Town may establish customary use by showing that the general area of the beaches has been subject to customary use that is ancient, reasonable, without interruption and free from dispute.

Buending, 10 F.4th at 1133 (footnote and internal citations and quotations omitted).

30

Important to the question of whether the doctrine constitutes a taking, the Florida Supreme Court has noted that, as a matter of Florida law, the "right of customary use of the dry sand area of the beaches by the public does not create any interest in the land itself. Although this right of use cannot be revoked by the landowner, it is subject to appropriate governmental regulation and may be abandoned by the public." Tona-Rama, 294 So. 2d at 78.

In short, pursuant to Florida Statutes § 163.035(2) and (4), the Town may keep its Ordinance in effect if the Court finds that the Town's evidence establishes by a preponderance of the evidence that the Town's residents and visitors have gained, by way of customary use, the right to use the privately-owned portions of the dry sand beach in the Town.

### 3.   Analysis

With that background, the Court will now address the four elements of customary use:

### (a) Ancient

Plaintiffs have consistently argued in this case that the Ordinance fails to define "ancient." However, neither the statute nor Tona-Rama defined the term. Plaintiffs have suggested that the public's use must be ancient to the point of the coronation of Richard I. But the doctrine's use of the

word is not so exacting. As _Trepanier_ observed, the phrase

"ancient use" is "an awkward concept in a new world society."

965 So. 2d at 293 n.22. Although no Florida court has parsed

the question, guidance exists in the period reviewed in _Tona-_

_Rama_. In that case, the First District Court of Appeal

described the record:

> A fair and objective consideration of all the evidence
> before the trial court establishes the following
> undisputed facts. _For more than twenty years_ prior to
> the institution of this action, the general public
> visiting the ocean beach area had actually,
> continuously, and uninterruptedly used and enjoyed the
> soft sand area of the beach involved in this proceeding
> as a thoroughfare, for sunbathing, for picnicking,
> frolicking, running of dune buggies, parking, and
> generally as a recreation area and a playground. . . .
> The City . . . has constantly policed the area for the
> purpose of keeping it clear of trash and rubbish and for
> preserving order among the users of the beach . . . and
> has otherwise exercised the police power . . . over the
> area for the convenience, comfort and general welfare of
> persons using and enjoying the beach area.

_City of Daytona Beach v. Tona-Rama, Inc._, 271 So. 2d 765, 766

(Fla. 1st DCA 1972) (emphasis added). So, in later deciding

that the defendant had succeeded on its customary use defense,

the Florida Supreme Court necessarily determined that the

evidence of the past twenty years sufficiently proved the

"ancient" requirement, even without the benefit of a history

expert. See _Tona-Rama_, 294 So. 2d at 78 ("The general public

may continue to use the dry sand area for their usual

32

recreational activities, not because the public has any interest in the land itself, but because of a right gained through custom to use this particular area of the beach as they have without dispute and without interruption for many years."). If the Tona-Rama court, which had just recognized a doctrine using the "ancient" standard, felt a twenty-year history was not ancient enough, it would have so ruled. Instead, it applied the doctrine to recognize that customary use had been established in that case on a history of just over twenty years. In this case, the Town's witnesses provided testimony regarding their use, and the public's use of the dry sand beach in the Town, with many going back over twenty years, and some going back to the 1950s. Indeed, the Court heard testimony, unrebutted by Plaintiffs, that some families are now on their third generation of familial use of the dry sand beach in the Town.

True, the Town did not call witnesses who could speak to how the beach was used as of the date the Town was incorporated and into the 1940s (perhaps because such persons are no longer living). The Town did offer testimony, however, from its history expert Dr. Knetsch regarding the earliest formation of the Town and certain facts which suggested public

uses of the beach even at that time. Plaintiffs did not call any historian of their own to provide any contrary evidence.

Plaintiffs offer authorities from outside of Florida to suggest the Town's burden on the "ancient" element should look far longer back in time. But what testimony there was at trial suggests that the portion of land which has now become Redington Beach was not occupied or even accessible (at least by car) until Mr. Redington began development efforts and others built a road connecting this land to the mainland. Asked during closing statements to provide the best caselaw on an appropriate lookback period, counsel for Plaintiffs suggested a case looking back one hundred years. The Town's live testimony took the court back seventy years.

Guided by what Florida legal authorities exist, the Court is satisfied that the evidence provided by the Town establishes the "ancient" element of the customary use doctrine as applied by the Florida courts.

**(b) Reasonable**

Under Florida law, if the legislative body does not define the word "reasonable," then "[t]he fact-finder must construe the word 'reasonable.'" State Farm Mut. Auto. Ins. Co. v. Sestile, 821 So. 2d 1244, 1246 (Fla. 2d DCA 2002); see also Donovan v. State Farm Mut. Auto. Ins. Co., 560 So. 2d

330, 331 (Fla. 4th DCA 1990) (defining what is "reasonable" and "necessary" as a question of fact for the jury). "Reasonable" is generally understood and defined in dictionaries to mean rational, appropriate, ordinary, or usual in the circumstances. The Court utilizes this generally understood definition.

In this case, the Ordinance recognizes nine activities. They are traversing the beach, sitting on the sand, in a beach chair, or on a beach towel or blanket, using a beach umbrella that is seven feet or less in diameter, sunbathing, picnicking, fishing, swimming or surfing off the beach, placement of surfing or fishing equipment for personal use, and building sand creations unless prohibited by the Town's sea turtle protection code. The Ordinance also expressly prohibits use of tobacco, possession of animals, and the erection or use of tents on the beach. The Ordinance also prohibits a member of the public from utilizing the beach within a fifteen-foot buffer zone located seaward from the toe of the dune or from any privately-owned permanent habitable structure that is located on, or adjacent to, the dry sand areas of the beach, whichever is more seaward.

The Court finds that the limited uses protected by the Ordinance, such as sitting on or traversing the beach,

creating sandcastles, picnicking, and using a seven-foot diameter umbrella for shade are all quintessentially common and reasonable uses of beaches in general, and of the Town's beach in this case. Likewise, using the dry sand beach while fishing at water's edge, surfing, or swimming (which of course are performed in the water) are also common and, in this setting, are reasonable as they have been historically practiced. The Town's witnesses consistently testified that they were respectful of the upland owners in that if they brought food and beverages they would clean up after themselves. They consistently testified that, even before the Ordinance, they saw what they perceived as the border between the 'public' beach and private property as the owner's seawall. Thus, the Town witnesses testified that they did not go beyond the seawall, and most stated they set themselves up well into the sand away from the seawall. And as to activities such as surfing (which the Court notes would be inclusive of what some Town witnesses called "boogie-boarding") and fishing, no testimony was offered that the parts of these activities taking place on the dry sand beach are somehow unreasonable.

For their part, Plaintiffs did not offer evidence to counter the reasonableness of these approved uses, other than

as related to their argument that customary use does not apply and that they should be able to exclude all others from their land given their ownership. Of those examples offered in Plaintiffs' respective amended complaints and discussed at trial (such as individuals engaging in sexual intercourse or use of drugs or building of fires), the Ordinance does not authorize these activities. Nor does the Ordinance preclude Plaintiffs from summoning law enforcement or fire department authorities to address such activities. And the Town agrees that, apart from the customary uses set forth in the Ordinance, Gulf front owners are free to exclude from their properties those who engage in other activities either prohibited by, or not authorized by, the Ordinance. This regulatory scheme sets a reasonable balance between attempting to protect the customary use rights of Town residents and visitors recognized by the Ordinance, and the private property rights of owners such as Plaintiffs.

Indeed, the reasonableness of the customary use rights recognized and regulated by the Ordinance may also be found in the fact that the use of the beach in the Town did not significantly change after the Ordinance's adoption. Plaintiffs uniformly testified that the beach was quiet and that no one seemed to be using it. Mrs. Fields confirmed that

37

the public "really didn't go behind our house." T II-190.
And, when Plaintiffs testified to summoning the Sheriff on an
issue, it was for persons engaging in activities not on the
Ordinance's list of recognized customary uses.

### (c)   Without Interruption

Again, absent a statutory definition, it is for the trier
of fact to determine how the phrase "without interruption"
will apply to the Town's affirmative defense. In this case,
the Town's witnesses all testified that, while intensity or
use may go up or down given the day of the week, or on
holidays, or given weather conditions, over time, the beach
in the Town (including parts of the dry sand beach which are
privately owned) was regular. For instance, Mr. Steagall
testified that these uses were "very consistent." T III-33.
Mr. Scarr testified that since he's lived in the Town in 1956,
his and his family's uses of the beach have been consistent,
and that other residents and visitors' uses have also been
"consistent over time." T III-75.

The Court finds that the Town's witnesses' testimony
about the regularity and consistency of their uses of the
beach in the Town, along with their observations of others
using the beach regularly and consistently, was not
persuasively rebutted by Plaintiffs. This testimony satisfies

the "without interruption" element of the customary use doctrine.

**(d) Free from Dispute**

The Florida doctrine of customary use does not impose an adversity requirement, and the doctrine applies even where the owner has given actual or implicit permission. See Tona-Rama, 294 So. 2d at 76-78 (contrasting prescriptive easement, which has an adversity requirement, with customary use, which does not). In this case, the Eleventh Circuit's opinion in Buending noted that the predecessor judge had dismissed evidence showing public use simply because the beachgoers could have been "invitees of the property owners." But the Buending court explained that pictures of large town gatherings on the dry sandy areas of the beach were not irrelevant for that reason. See Buending, 10 F.4th at 1134 ("[T]he Florida doctrine of customary use does not impose an adversity requirement, and the doctrine applies even where the owner has given actual or implicit permission. . . . [P]ictures of large town gatherings on the dry sandy areas of the beach are not irrelevant to determining customary use just because a property owner may have attended the gathering or because the attendees might have had permission to be there." (citations omitted)). Therefore, the various

photographs provided to the Court, along with the testimony of Town-sponsored or POA-sponsored events that may have occurred with the acquiescence of one or more beachfront owners is still relevant to establishing that the uses were free from dispute.

Apart from such events, the Town's witnesses uniformly testified that, besides some confrontations with Plaintiff Shawn Moore (whose home was directly adjacent to Beach Park), beachfront owners simply did not express any opposition to how the dry sand beach beyond their seawalls was used by the public. For instance, Mr. Steagall testified that he was never confronted or chased away from the beach while using it during the entire time he lived in the Town. T III-36. According to Mr. Steagall, "this is a very friendly beach. The people know each other." T III-35.

Mr. Scarr testified that in his 68 years (interrupted only by his college years) residing in Redington Beach, no beachfront owner had ever confronted him and directed him to leave. T III-71. And Mr. Scarr's daughter Kelly Scarr Johnson testified, "I never knew anything different. Learning about this trial, I guess, was the first time it ever crossed my mind that that was not public beach." T III-107.

When asked to discuss the issue of dispute, Mrs. Scarr Johnson, who grew up in Town and still brings her kids back to her parents' home today, testified homeowners would "not once" ever come out and shoo her away:

> We feel like it's our beach. There's a pride there to take care of it. It's a special place, you know, for the residents and their guests.

T III-110. She also recounted, as an example of the mindset of longtime residents, that she and her family did "a small wedding" for her aunt on the beach once, and that after the wedding, she and her mother were cleaning up the sand when a beachfront owner came out. The owner was "super kind" to the Scarrs and thanked them for cleaning. But Mrs. Scarr Johnson thought that "was kind of odd, because I always thought that wasn't private property." T III-115-116. But apart from that non-confrontational exchange, when the Scarrs had set up a small wedding in what apparently was the private sand of an owner, that was "the only interaction I think I've ever had with any homeowner on the beach." Id.

Mrs. Steagall testified that in her over three decades of residency in the Town, as she and her family and guests went "all the way from Madeira Beach up to North Redington," she was "never" asked to leave the beach by any homeowner

and, "in fact, a lot of the property owners on the beach would be out with us and speaking with us." T III-122.

In addition to evidence of the acquiescence of owners over time, the Court also heard testimony of the actual perceptions of those Town residents (and former child residents who have since moved but still visit). They testified as to what they actually thought and felt about the status of the dry sand beach waterward of the residents' seawalls. Mr. Steagall testified:

> Well, we've always been using it. I know at one time I thought everyone had a public easement, because everybody's been doing it openly and continuously… And I remembered that from a longtime ago in school. It shocked me that someone even did not want the residents to come in there and not utilize the beach because it has always been utilized by the families and by the children and people jogging and exercising, playing sports.

T III-37. Barry Scarr testified, when asked how he came to understand that it was acceptable for him to be on the beach:

> I don't know that . . . I ever understood anything, because nothing ever happened. So I don't even know what this is about. But in my whole life, there was never an issue about anything with the beach, or the sand, nothing, ever. Not one word or one opposition. Nothing until somewhat recently, in the last couple of years.

T III-68.

42

Former POA president Sulewski testified, when asked about being on private property during a POA event or when he was personally using the beach:

> We never thought about it. Just understood that the beach was open to the public, including the dry sand, yes. . . . . And we did respect not going too close to the property line. Some people had bushes in front, so we would never penetrate that area.

T III-139. Clearly, residents and visitors came to view the "property line" of the beachfront owners as being the seawall. As inconsistent with the owners' deeds as that may be, the lack of confrontation over non-owner use of the privately-owned dry sand over such a long period supports a finding that such use was free from dispute.

Mayor Will described his view of how residents viewed their right to go onto the beach from his perspective and experience:

> Well, when I first came down here I didn't know anything about any of that stuff, whether there was a mean high water line or not. So we utilized the areas from the seawall into the water. That to us was considered the beach. . . . When you would walk down one of the beach accesses in between the houses . . . then when it hits the sand, when you look to your left and to our right, there are seawalls. So when you are standing on the sand – say the floor here is the sand – the seawall is about this high or so. It's about three or four feet of this. So you look left and right. And then on top of a lot of those seawalls there's a fence. So on the side of that fence, there's grass and they have their palm trees and things like that. So it's an obvious distinction that,

here's the beach and here is the seawall and somebody's
yard.

T IV-146-47. Given that's how he and other residents perceived
"the beach" and came to view "the beach" as not being part of
the adjoining home's parcel, Mayor Will testified that going
onto the dry sand beach "was always done." Id. at 147. "You
go out there and there's other people out there. We would do
this on a regular basis. And the beach was always thought of
as a public area to access." Id.

In sum, the Town's witnesses, whose testimony the Court
credits after personally observing their demeanors during
trial, established that until certain Plaintiffs confronted
some Town residents to "get off their land" after the
Ordinance was adopted, the use of the beach was free from
dispute.

### C.   Conclusion as to Takings Claims

The Court finds that the evidence provided by the Town
at trial substantially surpassed the quantum of proof
necessary to establish its affirmative defense. Therefore,
the Court finds that the Town has proven the customary use of
the privately-owned dry sand beach in the Town, and that those
uses are consistent with the limited permitted uses set out
in the Ordinance. Further, the Town has proven that this

customary use has been by both Town residents and those who may visit the Town either as vacation renters or guests of residents. Thus, Plaintiffs' takings claims (Counts I and II) fail.

### D.   __First Amendment Retaliation Claim__

In vacating the predecessor judge's grant of summary judgment to Mrs. Fields on her First Amendment retaliation claim, the Buending court characterized Mrs. Fields' status as a Board of Adjustment ("BOA") member as akin to that of an "employee." It then indicated that the Court erred in granting summary judgment because there was conflicting evidence as to whether Mrs. Fields orally resigned at the Commission meeting. Buending, 10 F.4th at 1135. At trial, Mrs. Fields continued to argue that she did not resign, and the Town continued to argue both that she did resign. The Town further argued that she should not even be treated under the First Amendment retaliation caselaw related to public employees because she was a volunteer member of a Town quasi-judicial board.

The Court, however, need not address the parties' dispute over the applicability of the Pickering[6] balancing

---

[6] __Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.__, 391 U.S. 563, 566 (1968).

test to this case. Regardless of whether Pickering applies, Mrs. Fields' claim fails because she orally and voluntarily resigned.

In Rodriguez v. City of Doral, 863 F.3d 1343 (11th Cir. 2017), the Eleventh Circuit confirmed that the "appropriate standard for determining the voluntariness of a public employee's resignation where a claim of First Amendment retaliation is involved" is the same "test for voluntariness that applies in the context of due-process claims." Id. at 1352. Under the due-process voluntariness framework, a resignation is presumed voluntary unless the employee points to "sufficient evidence to establish that the resignation was involuntarily extracted." Hargray v. City of Hallandale, 57 F.3d 1560, 1568 (11th Cir. 1995). Involuntariness can be found: "(1) where the employer forces the resignation by coercion or duress; or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee." Id. (citations omitted).

Claims of duress and coercion must take into account "whether, under the totality of the circumstances, [the employer's] conduct in obtaining [a] resignation deprived

[the employee] of free will in choosing to resign." Rodriguez,

863 F.3d at 1352. A non-exhaustive list of five factors guides

the analysis into this inquiry:

> (1) whether the employee was given some alternative to
> resignation; (2) whether the employee understood the
> nature of the choice [she] was given; (3) whether the
> employee was given a reasonable time in which to choose;
> (4) whether the employee was permitted to select the
> effective date of the resignation; and (5) whether the
> employee had the advice of counsel.

Id. (citations omitted).

Here, Mrs. Fields was present at the Commission meeting

to hear the discussion, was offered an opportunity to react,

and voluntarily stated she was fine with resigning if the

Commission desired. Mrs. Fields was not compelled to make her

offer. She could have sat quietly to see where the discussion

went. She could have asked to speak to counsel first. She

could have stated she would not resign and demanded removal.

Yet she opted to resign if the Commission so desired. The

record at trial does not support a claim that Mrs. Fields, an

educated, successful professional, did not understand the

nature of her options. While the Commission did not offer

Mrs. Fields time to choose a course of action, that is because

she told the Commissioners at the meeting as it was

progressing that if they wished her to resign, she would. It

would be illogical thereafter for Commissioners to not simply poll themselves for an answer, as they did.

As for being able to select a date, because Mrs. Fields unconditionally "accepted" the Commission's resignation desire in open session, it was effective at that time.[7] While Mrs. Fields did indicate at trial that she felt under "pressure" to resign, the audio of the meeting played at trial does not reveal such pressure. The record developed at trial does not reveal facts sufficient to overcome the voluntary nature of her resignation offer. See Hargray, 57 F.3d at 1570 (employee under criminal investigation who made resignation decision at police station under time pressure and without counsel was not coerced where he was free to leave, knew the charges against him, never asked for more time or to speak with his supervisor or an attorney, and the meeting transcript revealed a "casual atmosphere").

Mrs. Fields did testify that she didn't volunteer "per se" because she felt she was "bullied into saying, after they all voted, yes, you need to resign. It wasn't till I got home

---

[7] The effective date of the resignation was the date of the Commission meeting. *Smith v. Brantley*, 400 So. 2d 443, 444 (Fla. 1981) ("a public officer's resignation, stated to be effective immediately, is effective upon submission to the proper authority").

I'm like, what the heck happened?" T II-212. But the audio recording admitted into the record and played in court revealed no such bullying. Indeed, after the Commission's poll of its members was completed, the only words spoken by any Commissioner were those of Mayor Simons. And all he did was to say, "Mrs. Fields" in the manner that he was giving her back the floor. Mrs. Fields did not respond that she was being bullied. All she stated was, "okay." And Mrs. Fields admitted at trial that it was a "true statement" that the audio recording confirmed that her words to the Commission were: "If you want me to resign, I will be more than happy to." T II-226. The Court concludes, based on its experience and common sense, that this sequence of events regarding a voluntary, unpaid position did not constitute bullying. The fact that Mrs. Fields then went home and re-considered her resignation is not relevant because, by that point, she had already resigned.

Mrs. Fields notes that Mayor Simons asked her to put her resignation in writing. She then attempts to argue that her subsequent refusal to do so in some way negated her resignation. But the fact remains that at the September 4, 2019 meeting, she offered to resign if the Commission desired it, and the Commission expressed that it did desire it, and

that she accepted this with an "okay." Indeed, what Mrs. Fields asks the Court to overlook is that Mayor Simons asked her to put *her resignation* in writing. In sum, Mayor Simons (not the full Commission) asked Mrs. Fields to create a written version re-stating what Mrs. Fields had already just verbally done: resign.

Further, while Mayor Simons asked Mrs. Fields to put her resignation in writing, Mrs. Fields did not, in that moment, note that she was still thinking about the matter. Any reasonable observer present at the Commission meeting that evening would have left with the understanding that Mrs. Fields had resigned from the BOA. The fact that the Mayor, upon not receiving a subsequent written resignation, asked the Commission at its next meeting to remove Mrs. Fields from the BOA does not negate that fact that Mrs. Fields had already resigned in open session, and under Florida law, that resignation was effective upon being submitted to the appointing authority. Indeed, other members of the Commission at the time did not see the need for this action since they felt Mrs. Fields had already resigned. For instance, then Commissioner Fred Steiermann testified that that in his view, Mrs. Fields "resigned, flat out, boom, resigned." T VI-71, and that when Fields pronounced her resignation at the

meeting, he considered it final, "guaranteed." Id. at 72.
Now-Mayor Will agreed that, "in that moment" Fields had
resigned. T IV-170.

Again, the Court listened at trial to the audio
recording, through which the Court was able to assess the
tone and context of the September 4th meeting. Based on this
review of the audio, the Court finds that Mrs. Fields'
resignation was completed at the meeting. The resignation was
automatic upon her offer to resign depending on the
Commissioners' thoughts and her immediate acceptance of the
Commissioners' opinions that she should resign. Despite
Plaintiffs' argument or some equivocal testimony at trial, it
was clear to the Court that no confirmatory resignation letter
was required to effectuate the resignation. Mrs. Fields' oral
resignation at the meeting was both voluntary and final.

Finally, while Fields testified that she felt she
performed well on the BOA and could have handled her position
during the litigation, the Commission had a valid concern
over her ongoing service. The BOA is charged with applying
the Town's adopted land use policies and Mrs. Fields was then
embroiled in a public suit over a land use matter which
impacted the ability of the vast majority of Town residents
to enjoy the Town's beaches. See Carpenter v. University of

*Ala. Health Services Foundation PC*, 773 F. App'x 507 (11th Cir. 2019) (noting that "good cause will exist so long as the employer had *prima facie* evidence that an arguable basis for discharge existed" (citation and internal quotation marks omitted)); *Christie v. United States*, 518 F.2d 584, 588 (Ct. Cl. 1975) ("This court has repeatedly upheld the voluntariness of resignations where they were submitted to avoid threatened termination for cause.").

Based on the foregoing, the Court finds that Mrs. Fields did voluntarily resign at the Commission meeting. Her words were unequivocal that if the Commission desired her to resign, she would. The Commission then polled itself and each member indicated in the affirmative.

Because Mrs. Fields resigned from her position on the BOA, and no exception to the voluntary nature of the resignation applies, she did not suffer an "adverse action" under either the Pickering framework or the political loyalty cases framework. Therefore, the Town prevails as to Mrs. Fields' First Amendment retaliation claim.

## V.   Conclusion

The Town has now prevailed on all claims presented at trial. A judgment will be entered consistent with this Order and prior orders of the Court related to the other Counts of

the respective Seconded Amended Complaints in these consolidated cases.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 12th day of August, 2024.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE